**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

July 1, 2020

No. 18-60264

Lyle W. Cayce
Clerk

GEORGE EDUARD NASTASE,

> Petitioner,

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

> Respondent.

Petitions for Review of the Orders of the
Board of Immigration Appeals

Before ELROD, WILLETT, and OLDHAM, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Romanian native George Eduard Nastase petitions for review of the Board of Immigration Appeals (BIA) decisions denying his applications for adjustment of immigration status and for a waiver of inadmissibility. The first petition is DENIED and the second petition is DENIED in part and DISMISSED in part for lack of jurisdiction.

I.

Nastase was born in 1985 in Romania. In 1986, he was admitted to the United States as a refugee in the care of his parents. After his parents divorced eight years later, Nastase lived with his mother and siblings. In 1999, his mother became a naturalized citizen.

No. 18-60264

In 2006, Nastase applied for adjustment of his immigration status under 8 U.S.C. § 1159(a), which (if granted) would cause him to "be regarded as lawfully admitted to the United States for permanent residence as of the date of [his] arrival into the United States." That application was denied in 2012 on the basis that Nastase's criminal record rendered him inadmissible. Specifically, the United States Citizenship and Immigration Services (USCIS) reasoned that his 2007 conviction for delivery of a simulated controlled substance made him ineligible for adjustment of status under 8 U.S.C. § 1182(a)(2)(C)(i), which states that "[a]ny alien who . . . the Attorney General knows or has reason to believe . . . is or has been an illicit trafficker in any controlled substance . . . is inadmissible." Nastase committed miscellaneous other crimes in 2012 and the years following: theft, credit card abuse, and criminal trespass—all misdemeanors—and felony possession of less than one gram of a controlled substance (methamphetamine).

Those crimes landed Nastase in the Dallas County Jail in 2012, where he was identified by Department of Homeland Security ("DHS") agents. DHS then instigated removal proceedings against him. Because Nastase was not in federal custody at the time, the Immigration Judge (IJ) administratively closed the proceedings.

When the removal proceedings restarted in 2017, DHS alleged two bases of removability: (1) that Nastase had been "convicted of two or more crimes involving moral turpitude" under 8 U.S.C. § 1227(a)(2)(A)(ii), and (2) that he had been convicted of a crime "relating to a controlled substance" under § 1227(a)(2)(B)(i). Nastase defended the charges by arguing that he had gained derivative United States citizenship when his mother became a citizen. *See* 8 U.S.C. § 1431(a). As all this was taking place, Nastase again applied for an adjustment of status under § 1159(a). This time, mindful of the denial of his

2

first application on inadmissibility grounds, he also applied for a discretionary waiver of inadmissibility under § 1159(c).

The IJ rejected Nastase's citizenship argument, concluding that his admission as a refugee did not meet the derivative citizenship statute's requirement of "lawful admission for permanent residence."   8 U.S.C. § 1431(a)(3).   The IJ also determined that Nastase was inadmissible under § 1182(a)(2)(A)(i)(II) and denied him a waiver after weighing a variety of equitable factors and finding that they ultimately weighed against him.  Given Nastase's inadmissibility, the IJ denied his application for an adjustment of status.

Nastase appealed these determinations to the BIA, which dismissed the appeal on essentially the same reasoning provided by the IJ.   Nastase proceeded to file a petition for review of the BIA's citizenship decision in this court, while simultaneously pursuing a motion for reconsideration of the waiver decision at the BIA.  When the BIA denied the motion, Nastase filed an additional petition for review of that denial.  The petitions were consolidated. *See* 8 U.S.C. § 1252(b)(6).  We take them in turn.

## II.

In his first petition for review, Nastase argues that he is not removable because his childhood admission as a refugee was a "lawful admission for permanent residence" and he thereby received derivative United States citizenship when his mother became a citizen in 1999.  We disagree.

## A.

We have jurisdiction to review Nastase's citizenship claim under § 1252(b)(5)(A).   *See also* 8 U.S.C. § 1252(a)(1) (jurisdiction over removal orders).  The question of whether refugee status equates to "lawful admission for permanent residence" ("LPR") status under the derivative citizenship

No. 18-60264

statute is a legal one that the court reviews de novo.  *See Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 393 (5th Cir. 2006).

LPR status is "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed."  8 U.S.C. § 1101(a)(20).   The derivative citizenship statute bestows citizenship on foreign-born children who meet three requirements:

> (1)  At least one parent of the child is a citizen of the United States, whether by birth or naturalization.  (2)  The child is under the age of eighteen years.  (3)  The child is residing in the United States in the legal and physical custody of the citizen parent *pursuant to a lawful admission for permanent residence.*

8 U.S.C. § 1431(a) (emphasis added).  Nastase "has the burden of proving that he qualifies for naturalization, and he must do so in the face of the Supreme Court's mandate that we resolve all doubts 'in favor of the United States and against' those seeking citizenship."  *Bustamante-Barrera*, 447 F.3d at 394–95 (quoting *Berenyi v. Dist. Dir., I.N.S.*, 385 U.S. 630, 637 (1967)); *see also I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988) (courts considering naturalization claims must ensure "strict compliance with the terms of an authorizing statute").

The Fifth Circuit has not decided whether *Chevron* deference applies to the BIA's interpretation of the derivative citizenship statute.  *See Bustamante-Barrera*, 447 F.3d at 393–94 (declining to decide whether *Chevron* deference applies to § 1432, the now-repealed precursor to § 1431).  However, the Fifth Circuit has concluded that *Chevron* deference never applies to non-precedential BIA decisions.  *See Dhuka v. Holder*, 716 F.3d 149, 154–56 (5th Cir. 2013).   The BIA's decision in this case has not been designated as precedential.  A non-precedential BIA decision is given whatever weight is

appropriate based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Dhuka*, 716 F.3d at 156.  In any event, this case does not turn on *Chevron* deference because our disposition would be the same whether we applied it or not.

## B.

To have met the requirements for derivative citizenship in 1999, as he claims, Nastase must have then been "residing in the United States in the legal and physical custody of the citizen parent *pursuant to a lawful admission for permanent residence*."[1]  8 U.S.C. § 1431(a)(3) (emphasis added).  He was not.

Nastase admits that no court in any jurisdiction has ever construed refugee status to include LPR status, and that the admission of refugees has traditionally been termed "conditional."  Oral Argument at 8:58; *see also In re D-K-*, 25 I. & N. Dec. 761, 767–68 (B.I.A. 2012) (discussing "the *conditional* nature of a refugee's status" and noting that "refugee admission is impermanent and subject to contingencies").  Nevertheless, he argues that his status as a refugee made him a permanent resident in the sense that he could reside in the United States "indefinite[ly] unless and until terminated."  Thus, he says, all refugees meet the statutory definition of "permanent": "The term 'permanent' means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the

---

[1] There does not appear to be any dispute that Nastase met the other requirements of the derivative citizenship statute in 1999: his mother became a naturalized United States citizen when he was under 18 years old and residing in his mother's custody on American soil.

United States or of the individual, in accordance with law."    8 U.S.C. § 1101(a)(31).

This contention is unpersuasive.    Even assuming *arguendo* that Nastase's construal of these definitional statutes "is not inconsistent with the language of th[e] provision[s] examined in isolation, statutory language cannot be construed in a vacuum." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  Indeed, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.*

As the Attorney General points out, the rest of the statutory scheme evinces a clear distinction between refugee status and LPR status.  Section 1159(a)(1)(C), for instance, discusses "alien[s] who ha[ve] been admitted to the United States" as refugees "who ha[ve] not acquired permanent resident status," a category of persons that would not exist if refugees were already LPRs.  In fact, that section requires refugees "to apply for adjustment to LPR status after being present in the United States for one year" if they have not already acquired LPR status. *Ali v. Lynch*, 814 F.3d 306, 313 (5th Cir. 2016). Nastase's interpretation would render this provision meaningless, violating the "principle that when interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous." *United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir. 2002).  Section 1159(a) is not the only provision that would make little sense if we accepted Nastase's view. *See, e.g.*, 8 U.S.C. § 1252(e)(4) (referring separately to aliens who are "lawfully admitted for permanent residence" and those who are "admitted as a refugee").

Nastase argues that his reading would not render § 1159(a) superfluous because a status adjustment under that section would have the functions of "produc[ing] the resident card necessary for international travel, employment authorization and other purposes" and catching refugees who have "become

No. 18-60264

inadmissible following their initial admission." Not so. As we have previously noted, § 1159(a)(1) expressly excludes refugees who have already "acquired permanent resident status" from obtaining adjustment under that subsection. *See also Ali*, 814 F.3d at 313. If refugees were automatically permanent residents, § 1159(a)(1) would lack a function. Nastase's interpretation "renders the [statutory provision] mere surplusage, a result that we cannot accept." *In re McBryde*, 120 F.3d 519, 525 (5th Cir. 1997).

As Nastase admitted in the immigration proceedings, he was only "conditionally"—not permanently—"admitted as a [r]efugee." As a result, he has not met the requirements of the derivative citizenship statute. His first petition for review is therefore DENIED.[2]

### III.

In his second petition for review, Nastase argues that he was improperly denied the waiver of inadmissibility necessary to permit him to adjust to LPR status under § 1159(a).[3] Some of Nastase's arguments invite us to review decisions outside our jurisdiction. To the extent Nastase makes a reviewable challenge, it lacks merit.

---

[2] In his reply brief, Nastase appears to argue that the Government should be equitably estopped from removing him because USCIS erroneously denied his earlier application for adjustment of status in 2012. He points out that USCIS treated his conviction for delivery of a simulated controlled substance as making him inadmissible as "an illicit trafficker in a[] controlled substance" under § 1182(a)(2)(C)(i), despite BIA precedent rejecting that proposition. *See In re Sanchez-Cornejo*, 25 I. & N. Dec. 273, 274–75 (B.I.A. 2010) (finding that convictions under Texas's "delivery of a simulated controlled substance" statute do not qualify as "illicit trafficking in a controlled substance" under the Immigration and Nationality Act). As an initial matter, "[a]n appellant abandons all issues not raised and argued in [his] *initial* brief on appeal." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994). Moreover, any prejudice accruing to Nastase because of the denial of his original application for adjustment of status was cured when he renewed his application during the proceedings at issue in this case. His renewed application was denied on different grounds, as explained *infra*.

[3] Nastase does not contest that his criminal record makes him inadmissible and thus that he cannot be adjusted to LPR status without a waiver.

No. 18-60264

A.

The Immigration and Nationality Act permits the Attorney General, in his discretion, to waive an alien's inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." 8 U.S.C. § 1159(c); *see Jean v. Gonzales*, 452 F.3d 392, 397 (5th Cir. 2006) ("The Attorney General has broad discretionary authority to grant or deny a waiver.").

In general, we lack jurisdiction to review the Attorney General's discretionary immigration decisions. *See Kucana v. Holder*, 558 U.S. 233, 245 (2010); 8 U.S.C. § 1252(a)(2)(B)(ii) (proscribing judicial review of "decision[s] and action[s] of the Attorney General . . . the authority for which is specified under this subchapter to be in [his] discretion"). However, we have jurisdiction to review those decisions to the extent the appeal involves "constitutional claims or questions of law." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020) (quoting 8 U.S.C. § 1252(a)(2)(D)). One such reviewable question is whether a BIA decision was made *ultra vires*. *See Jean*, 452 F.3d at 396; *see also City of Arlington v. FCC*, 569 U.S. 290, 298 (2013) (an agency acts *ultra vires* when it "go[es] beyond what Congress has permitted it to do").

The BIA's denial of a motion for reconsideration is reviewed "under a highly deferential abuse-of-discretion standard." *Zhao v. Gonzales*, 404 F.3d 295, 303 (5th Cir. 2005). This means that courts will only disturb such a ruling if it is "capricious, racially invidious, utterly without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach." *Id.* (quoting *Pritchett v. I.N.S.*, 993 F.2d 80, 83 (5th Cir. 1993)).

B.

First, Nastase contends that the BIA acted *ultra vires* by applying a "heightened standard" to his waiver application. He analogizes to our decision

in *Jean*, where we determined that the Attorney General acted within his authority in applying a heightened standard to waiver applications from aliens who had "engage[d] in violent criminal acts."  452 F.3d at 397 (quoting *In re Jean*, 23 I. & N. Dec. 373, 384 (B.I.A. 2002)).  Because he is not a violent criminal, Natase argues, a heightened standard is inappropriate here.

This argument fails because the BIA did not apply a heightened standard to Nastase.  In *Jean*, we noted that the Attorney General required violent criminals to show that "extraordinary circumstances" supported their waiver application—a requirement not imposed on typical applicants.  *Id.* (quoting *In re Jean*, 23 I. & N. Dec. at 397).  No such requirement was imposed on Nastase.[4]  Instead, the BIA applied the normal standard, "balancing the various humanitarian, family unity and public interest considerations presented."  *See* 8 U.S.C. § 1159(c).  Nastase does not persuasively explain in his briefing why he believes a heightened standard was imposed on him, merely stating that the proposition "[t]hat a 'heightened standard' has been applied to [him] can hardly be denied."  Nastase does cite to his motion to reconsider at the BIA, where he compared the equities in his case to the equities in other cases and argued that his waiver application "involved less grave crimes and presents greater equities" than the applications in those other cases.[5]  Simply put, Nastase's contention that the BIA should have weighed the equities more in his favor does not establish that the BIA applied

---

[4] Indeed, after explaining the *Jean* standard for violent and dangerous criminals, the IJ found it inapplicable, noting that Nastase "has not committed a 'violent or dangerous' crime."  The BIA agreed.

[5] For instance, Nastase states that he came to this country when he was only one year old and has been here for thirty years.  He does not speak Romanian, and most of his relatives live in the United States.  And he allegedly would have become a citizen of the United States as a child had his mother known at the time that she needed to submit a status-adjustment application for him.

No. 18-60264

a heightened standard to his waiver application and thereby acted *ultra vires*.

Thus, to the extent Nastase's petition presents the legal issue of whether the BIA applied that heightened standard, the petition must be denied.  To the extent Nastase's petition presents the issue of whether the BIA should have weighed the equities of his case more favorably to him, we are without jurisdiction to consider it for the reasons explained *infra*.  Nastase may not—merely by "phras[ing] his argument in legal terms"—"use[] those terms to cloak a request for review of the BIA's discretionary decision, which is not a question of law."  *Delgado-Reynua v. Gonzales*, 450 F.3d 596, 599–600 (5th Cir. 2006).

Turning now to the second issue he raises in his second petition, Nastase argues that the BIA improperly denied his motion for reconsideration when he had in fact identified a legal error in its decision: failing to consider factors relevant to one of the statutory grounds for a waiver, "humanitarian purposes." *See* 8 U.S.C. § 1159(c) (permitting the Attorney General to waive inadmissibility "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest").  He argues that this error is clear because the BIA did not specifically mention certain alleged facts that might weigh in his favor on that factor, such as his "young age at the time of his admission" and "his inability to speak the language of his native country."

But whether or not the BIA considered each of the facts Nastase alleged, we are without jurisdiction to review its discretionary decision.  The statute permits the Attorney General to provide a waiver "for humanitarian purposes," but does not require it.  As we have held in an analogous context, the "conten[tion] that the [Attorney General] did not consider all of the relevant factors" in denying discretionary relief "does not involve a constitutional claim or a question of law; therefore, this court does not have jurisdiction to review [the] claim." *Sung v. Keisler*, 505 F.3d 372, 377 (5th Cir. 2007); *see also Sattani v. Holder*, 749 F.3d 368, 372 (5th Cir. 2014) ("Petitioners' claim that the IJ did

not properly take into account all the hardship factors merely asks this Court to replace the IJ's evaluation of the evidence with a new outcome, which falls squarely within the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(B).").

The Supreme Court's recent decision in *Guerrero-Lasprilla* does nothing to change this analysis. In that case, the Supreme Court took up the question of how to distinguish reviewable legal issues from unreviewable factual issues. *See Guerrero-Lasprilla*, 140 S. Ct. at 1068. The result was holding that "the application of a legal standard to undisputed or established facts" is a "question[] of law" under § 1252(a)(2)(D) and is therefore within the jurisdictional compass of the federal courts of appeals. *Id.* Our cases disclaiming jurisdiction over the BIA's decision whether to grant a § 1159(c) waiver of inadmissibility are not based on whether that decision is too "factual" to be a "question[] of law"—rather, they are based on the simple observation that the Attorney General's power to grant a § 1159(c) waiver is purely discretionary. *See Jean*, 452 F.3d at 396. Because *Guerrero-Lasprilla* does not disturb that precedent, it does not lend support to Nastase's arguments in this petition.[6]

IV.

For the reasons stated, Nastase's first petition for review is DENIED. His second petition for review is DENIED in part and DISMISSED in part for lack of jurisdiction.

---

[6] Even assuming *arguendo* that *Guerrero-Lasprilla* did disturb our precedent on a claim such as this, Nastase fails to show that the BIA's decision was "capricious, racially invidious, utterly without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach." *Zhao*, 404 F.3d at 303 (quoting *Pritchett*, 993 F.2d at 83). There is no indication that the BIA failed to consider Nastase's humanitarian factors in its decision; the BIA expressly stated that its decision reflected a "balancing" of "the various humanitarian, family unity and public interest considerations presented in this matter."